[Crim. No. 11457. Fourth Dist., Div. One. Dec. 23, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES EUGENE HEFNER, Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Barbara A. Smith, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WORK, J.**—James Eugene Hefner was convicted on two counts of lewd and lascivious acts with a minor (Pen. Code, § 288)[1] one count of oral copulation (§ 288a) and one count of annoying and molesting a child under 18 years of age (§ 647a). Hefner justifiably complains he was prejudiced by the negative courtroom atmosphere created by numerous barbed quips and demeaning comments, directed primarily at Hefner's counsel, by the trial court in the presence of the jurors. Since we reverse for instructional error for the reasons following, we do not determine whether the conduct of which Hefner complains would, standing alone, justify reversal. However, because the allegation is one made with surprising frequency, we discuss it at length in the context of this record.

Hefner was convicted for: Count I—a May 24, 1978, lewd act upon his granddaughter, Shannon. Count II—a November 11, 1977, lewd act upon his granddaughter's friend, Merisa. Count III—a November 11, 1977, act of oral copulation upon Cindy, a minor under the age of 16. Count IV—"on or about" November 11, 1977, unlawfully annoying Cindy. Hefner's first trial adjourned with the jury deadlocked seven to five.

---

[1]All statutory references are to the Penal Code unless otherwise specified.

Hefner alleges the court erred as follows: the trial judge's display of proprosecution bias; the court's failure to give, *sua sponte*, CALJIC No. 17.01 (jury must agree on a specific act to convict defendant on any given charge); improperly admitting transcripts of the victims' preliminary hearing and first trial testimony as substantive evidence; allowing his wife to be cross-examined so as to disclose his 22-year-old previous child molesting conviction; allowing hearsay evidence of a victim's complaint of his conduct and certain hearsay statements made by Shannon; and in admitting evidence of uncharged offenses committed upon the victims.

### Judicial Decorum

When lawyers leave trial practice to assume the trial bench, they do more than change attire, they are suddenly, and oftentimes traumatically, thrust out of their starring role in the courtroom melodrama, off the center stage and into a director's role. Although they contribute cameo appearances during jury trials, their duty is to subordinate this supporting role so as not to upstage the efforts of those lawyers headlining the performance. "Trial Judges should bear in mind Socrates' admonition:

"'Four things belong to a judge: to hear courteously, to answer wisely, to consider soberly, and to decide impartially.'" (*Etzel* v. *Rosenbloom* (1948) 83 Cal.App.2d 758, 765 [189 P.2d 848].)

The record here is replete with blunt, caustic and cynical remarks by the trial judge smacking of proprosecution bias. Those made in the presence of the jury unmistakeably denigrated the credibility of defense counsel, his client, his witnesses and his case. We provide a sample:

Several times during the trial, defense counsel read, for impeachment purposes, previous testimony of prosecution witnesses. At least twice, the trial judge interrupted him in the presence of the jury with remarks inferring the attorney was attempting to trick the jurors through conduct in which, the judge hinted, he did not believe the prosecution would engage. For example, when cross-examining Shannon, defense counsel read from the transcript of her testimony at Hefner's first trial. The court, without any objection having been expressed by the prosecutor, interrupted: "Counsel, just read the question and the answer. You don't have to give inflection to the answer that you may or may not like." This was shortly followed by the following unsolicited remark to

defense counsel during the prosecutor's redirect examination of a youthful witness:

"[PROSECUTOR]: Shannon was inside?

"A[NSWER]: No, Shannon was outside with me.

"[DEFENSE COUNSEL]: I didn't hear that answer.

"THE COURT: You know, I asked one of the judges at lunch how do you handle it when the lawyer doesn't always hear the answers that are favorable to him and I was talking to 20 judges, and we never came to an answer; that may be to point it out, you know, it was odd."

The court immediately followed this pointed jibe with a proper admonition for the jurors to ignore his comments to counsel in deciding the facts of the case.

The trial court's displeasure with defense counsel was more emphatically expressed in chambers when he was told, "quite frankly, counsel, the way you tried the case, I won't accept your statement even as an officer of the court."

But shortly, in open court, the judge accused defense counsel of misstating evidence in order to circumvent the court's chamber ruling on the admissibility of evidence.

The public scoldings continued when defense counsel was cross-examining Cindy. Counsel read from her testimony at Hefner's first trial and the judge, on his own, ordered, "in fairness to the witness," the entire transcript of her testimony at the first trial be read to the jury. The following exchange then took place:

"THE COURT: So, I am going to order that the whole testimony be read to her right now and we'll start—do it any way you want to, but I want the whole testimony read to the jury.

"[Defense Counsel]: Yes, your Honor. Shall I start with the preliminary hearing?

"THE COURT: No, I am going to have the district attorney, because I don't like the way you put emphasis on certain words, and your 'uh huh's,' after every answer.

"[Prosecutor]: Would it be possible to have a third party, one of our investigators read it?

"THE COURT: If you have one, get an investigator to read it.

"[Prosecutor]: I have one sitting here in the court room. Can I ask her if she could do it?

"THE COURT: I'd prefer that and you represent one or the other side, and I would prefer to have a neutral party to read that."

In context, these remarks could not help but convey the judge's apparent impression that defense counsel was being unfair to the witnesses involved by the manner in which he read their previous testimony, whereas the prosecutor, or even his investigator, could be relied on to be fair. Furthermore, in the second instance, the judge may well have conveyed to the jury the impression that he believed the witness' testimony, and defense counsel's efforts to impeach it to be inconsistent with "fairness to the witness." If appropriate, these, and similar admonitions, should have been conveyed out of the hearing of the jurors.

Hefner's defense depended on drawing the jury's attention to multiple, and in some cases, substantial contradictions in testimony of the complaining witnesses. The court's remarks were such as to detract the jury from impartially weighing these significant contradictions.

When the prosecutor on direct examination of Shannon's brother was attempting to establish times at which he and his sister had visited their grandfather Hefner, the judge, again unsolicited, said in the presence of the jury: "As a practical matter, for the edification of both counsel, if you have adults who can establish times, places, persons, presence, I would suggest that for other than testing the witness' memory, that you use those people after you got an answer once or twice that they really don't know, *because when you look at the age of the children we are talking with, I don't have any quarrel that they may not remember these things, and times and places. And if you have adults, other witnesses who might, I would suggest you use those.*" (Italics added.) These remarks tend to suggest the jurors should not concern themselves with the lack of specifics or contradictions in the testimony of minor witnesses.

■    Judicial statements tending to show bias do not require reversal for a conviction based on overwhelming evidence of guilt. (See, e.g., *U.S.* v. *Poland* (9th Cir. 1981) 659 F.2d 884.) However, while the evidence here would support a guilty verdict, it is not overwhelming. There were numerous testimonial contradictions by the complaining witnesses, as well as some statements, which on their face, are doubtful. The jury could have reasonably rejected the credibility of the witnesses and dismissed the more improbable or inconsistent parts of their stories as, say, the product of faulty young memories which nonetheless were capable of accurately testifying as to the criminal acts of which Hefner was accused. However, the potential influence of the court's remarks on the credibility of the various witnesses in the eyes of the jury is great. There was also evidence that in a bitter divorce and custody proceeding prior to the offenses of which Hefner is accused, Hefner filed an affidavit in support of his son-in-law's position that his daughter, who testified against him here, was not fit to raise the children. The defense sought to show the accusations against Hefner were a result of his daughter's natural desire for revenge for aiding her husband during his successful custody battle. There was some indication that a tearful Shannon was coached by her mother during a recess in the trial, and her father testified that Shannon had confessed similar testimony she gave during the first trial was false.

Thus, evidence of Hefner's guilt, while substantial, was not overwhelming. Under these circumstances, the possibility that judicial appearance of bias could have prejudiced the jury against Hefner is too strong to be ignored.

Further, it is unlikely that the cumulative prejudicial effect of the judge's remarks interspersed throughout the trial, indicating the prosecutor and his witnesses were more trustworthy than Hefner's, could have been negated merely by judicial admonitions to the jury.[2]  ■ "In cases where an admonition of the judge to the jury to disregard his misconduct would not remove the prejudicial effect of such misconduct, it is not a prerequisite to urging such error on appeal for the appellant to have objected thereto and made a request that the jury be instructed to disregard it. (*Estate of Golden*, 4 Cal.2d 300, 311 [48 P.2d 962].)" *Etzel* v. *Rosenbloom, supra*, 83 Cal.App.2d 758, 762.)

---

[2]Indeed, the court's continued public innuendo following these admonitions could well lead a juror to believe the admonition was not meant to be taken seriously.

This is particularly true in a child molesting case such as this. As our Supreme Court has said: "With respect to this kind of case, when it is remembered that 'There is no class of prosecutions attended with so much danger, or which affords so ample an opportunity for the free play of malice and private vengeance,' and that 'In such cases the accused is almost defenseless,' it certainly behooves the courts of last resort rigorously to insist upon the observance of those salutary rules regarding the admission of evidence and the trial of actions in general, which for centuries have been in practice to the end that an accused may be assured of a fair trial. As frequently has been said regarding cases of the instant character, 'No charge can be more easily made, and none more difficult to disprove.' . . . Errors committed either by the prosecution or by the court in the course of the trial, which ordinarily might be considered trivial and as of no material consequence from a standpoint of adverse effect upon the rights of a defendant, may become of great importance when committed in a case of the character of that here involved." (*People* v. *Adams* (1939) 14 Cal.2d 154, 167-168 [93 P.2d 146], overruled on other grounds, *People* v. *Burton* (1961) 55 Cal.2d 328 [11 Cal.Rptr. 65, 359 P.2d 433]; see also, e.g. *People* v. *Black* (1957) 150 Cal.App.2d 494, 499-504 [310 P.2d 472].)

*Instructional Error*

■ Hefner argues the jury should have been instructed with CALJIC No. 17.01 (jury must agree on one specific act to convict under any given count).

It is a fundamental principle of our criminal justice system that the prosecution must prove beyond a reasonable doubt "every fact necessary to constitute the crime with which . . . [the defendant] is charged." (*In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].) It is also clear where evidence presented to the jury indicates more than one act which may constitute the charged offense, the jury must be instructed it must unanimously agree on the specific criminal act in order to convict the defendant. (*People* v. *Madden* (1981) 116 Cal.App.3d 212, 218-219 [171 Cal.Rptr. 897]; *People* v. *McNeill* (1980) 112 Cal.App.3d 330, 335-336 [169 Cal.Rptr. 313].)

There was evidence of more than one act on which the jury could have convicted Hefner under each of these counts. This problem was compounded by somewhat confusing testimony of the victims as to dates, times and sequence, and by the use of "on or about" language in

the information to allege the dates of the offenses charged. Hefner, therefore, had a right to have CALJIC No. 17.01 given to the jury, *sua sponte*, on these counts. We have no way to gauge the effect of this error. Since we cannot assume the jurors unanimously agreed on the act constituting the offense charged, we are unable to say a miscarriage of justice did not occur. (*People v. Gainer* (1977) 19 Cal.3d 835, 854-855 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73].)

### Evidentiary Error

The trial court also erred in, on its motion, ordering Cindy's prior testimony from the preliminary hearing and the first trial into evidence, for the truth of the matters stated. The People argue it was appropriate to admit the prior testimony, relying on Evidence Code section 1237, subdivision (a). However, the necessary foundation for admitting prior testimony under Evidence Code section 1237, subdivision (a), was not laid as to all of the matters to which Cindy testified in the first two proceedings. At most, it would have been proper to admit prior testimony under Evidence Code section 1237, subdivision (a), as to those matters which Cindy testified she could not remember clearly. By admitting the previous testimony in its entirety for the truth of the matters stated, the trial court went well beyond this. For example, Cindy's testimony at the last trial contained reference to only one instance of oral copulation upon her, and she did not express any inability to recollect how many times Hefner had performed this act on her. However, her preliminary hearing testimony, while somewhat confusing, is susceptible to the interpretation that Hefner, in fact, orally copulated her two different times. The potential prejudicial effect of this error is compounded by the failure to give CALJIC No. 17.01 (see discussion above).

### No Error

Hefner's remaining contentions are not meritorious. Citing numerous contradictions and apparent implausibilities in the testimony of prosecution witnesses, Hefner claims that the evidence is insufficient to support the guilty verdict. It is true these contradictions and discrepancies make the prosecution's case less than overwhelming; however, there is sufficient evidence upon which a reasonable jury could convict. (*People v. Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468].) The jury could reasonably conclude the ambiguities resulted from the fading recollection of the complaining witnesses, rather than falsehood.

■ Hefner complains of the admission of hearsay statements by Merisa and Shannon. However, the trial court correctly admitted these statements not to show the truth of the statements, but to rebut the defense theory of the case—i.e., the victim's stories were a fabrication by which Shannon's mother sought revenge upon Hefner.

■ Hefner claims foul because the trial court permitted the prosecution to question his wife about her knowledge of Hefner's 22-year-old prior felony conviction for molesting her own child. The defense itself raised the issue by eliciting from Mrs. Hefner testimony that she had not seen her husband sexually molest children. It was, thus, appropriate impeachment for the prosecution to show she was aware of the prior conviction, which, in fact, took place while she was married to him, to negate the aura of good character created·by the artfully crafted defense questioning.

■ Finally, Hefner complains of testimony at the trial of other, uncharged offenses upon the victims. This was proper since the jury was instructed to consider these only in relation to Hefner's disposition toward the complaining witnesses.

The judgment is reversed.

Brown (Gerald), P. J., and Cologne, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 17, 1982.